Richard L. HUDSON, Plaintiff-Appellant,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION and Thomas Connolly, Defendants-Appellees.

No. 305, Docket 79–7371.

United States Court of Appeals, Second Circuit.

Argued Jan. 24, 1980.

Decided April 8, 1980.

David S. Golub, Stamford, Conn. (Silver, Golub & Sandak, P.C., Jay H. Sandak and Richard A. Silver, Stamford, Conn., of counsel), for plaintiff-appellant.

Eugene P. Souther, New York City (Seward & Kissel, Kenneth J. Kelly, New York City, of counsel), for defendants-appellees.

Before MULLIGAN, VAN GRAAFEILAND and KEARSE, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a judgment by the United States District Court for the Southern District of New York dismissing plaintiff's complaint after a five day non-jury trial before the Honorable Robert L. Carter. The plaintiff Richard Hudson is black and has been employed by International Business Machines Corporation ("IBM") since August 1963. He commenced this suit on December 5, 1973, pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and 42 U.S.C. § 1981.[1] Hudson claims that during the relevant period, December 5, 1970 to December 5, 1973,[2] his employer and one of its white managers, defendant Thomas Connolly, discriminated against him on the basis of race through their promotional policies. He alleges that there are no similarly situated white employees in his division who have not progressed beyond his level at IBM. Further, Hudson claims that IBM retaliated against him because he filed complaints in accordance with IBM's "open door" employee grievance procedure on four occasions, and because he lodged a formal complaint with the New York State Human Rights Division alleging discrimination by IBM. In a pre-trial ruling, then Judge Harold R. Tyler ruled that Hudson could not maintain a separate claim for retaliation under section 1981 since that statute applies only to discrimination based on race. *Hudson v. IBM*, 9 EPD ¶ 9991 [CCH] (S.D.N.Y.1975). After the trial, Judge Carter concluded below in an oral opinion that Hudson had failed to carry his burden of establishing that he had been discriminated against be-

---

1. In a pre-trial ruling, the Honorable Harold R. Tyler dismissed Hudson's Title VII cause of action on the ground that the action was not commenced within the statutory period of ninety days following receipt of notice of right to sue from the Equal Employment Opportunity Commission (42 U.S.C. § 2000e–5(f)(1)). *Hudson v. IBM*, 73 Civ. 5151 (S.D.N.Y. April 17, 1974).

2. Judge Tyler ruled prior to trial that Hudson was barred from asserting claims of discrimination arising prior to December 5, 1970 under the applicable three-year period of limitation (N.Y.C.P.L.R. § 214(2) (McKinney Supp. 1979)). *Hudson v. IBM*, 9 EPD ¶ 9991 [CCH] (S.D.N.Y. 1975).

cause of his race either by Connolly or by IBM. This appeal followed.

Appellant Hudson began his career at IBM as a calibration technician, one of the lower level non-professional positions at the company. At that time, he had only a diploma from a technical school and had completed two semesters of college. From 1963 to 1967, appellant attended college at night, largely at IBM's expense,[3] and earned a Bachelor's degree in mathematics. In November 1967, he was promoted to the position of Associate Engineer at level 52, the lowest of twelve professional levels at IBM. In 1968, however, appellant decided to abandon engineering. He became a computer programming trainee, a position he retained at his professional-level title and salary despite his lack of experience in the area until May 1969. At that time, Hudson decided to once against change his career path and entered his present field of endeavor, personnel and education. As before, appellant retained a level 52 salary while learning his new job, but his title was changed to Education Specialist. Moreover, he requested and was granted a transfer to IBM's Programming Center in New York City where he had been accepted as a candidate for a Master's Degree in sociology at the New School. Appellant was ultimately awarded his doctorate in sociology in 1978, and IBM paid for his graduate studies pursuant to its tuition refund program,[4] even though sociology is a subject unrelated to Hudson's job in personnel and education.

In late 1969, after appellant had been working in his new personnel position for about six months, defendant Connolly rated appellant's job performance pursuant to IBM's appraisal and promotion practice as "exceeds requirements." At that time, the satisfactory appraisal levels were "outstanding," "exceeds requirements," and "meets requirements." When Connolly and appellant discussed the appraisal, Connolly informed Hudson that he was not then promotable beyond his entry level position in

IBM's professional work force. However, Connolly suggested various classes and programs in which Hudson could participate in order to learn more about his new position at IBM and thereby improve his chances for promotion.

When appellant had not been promoted by May 1970, he began a proceeding against IBM before the New York State Division of Human Rights charging that the company's appraisal program discriminated against him because of his race. Hudson's complaint was ultimately dismissed on the ground that there was no probable cause to believe that IBM had engaged in any unlawful discriminatory practice. While the proceeding was pending, appellant was denied direct access to personnel files containing salary and appraisal data concerning other employees. However, one of appellant's former managers at the Programming Center testified that appellant did not require this information in order to perform his job.

During the period applicable to this litigation, the satisfactory appraisal ratings at IBM were expanded into four categories: 1) far exceeds the requirements of the job in all areas, 2) consistently exceeds the requirements of the job, 3) exceeds the requirements of the job at times, and 4) meets the requirements of the job. During 1971, Hudson was twice awarded "3" ratings, first by Connolly and later by his white replacement, John Bergren. In later 1971, Bergren was succeeded as manager of the Programming Center by Donald McKethan, a black. When appellant raised the question of his promotability with his new manager, McKethan told him that there were no positions to which appellant could be promoted at the Programming Center, and that in fact the Center was to be phased out in 1973. McKethan suggested and instigated Hudson's transfer to the position of Associate Instructor at the Opportunities Industrialization Center ("OIC") in New York City. The OIC is a private community-ac-

**3.** Under IBM's tuition refund program, the company refunds to any employee 80% of the tuition he pays.

**4.** See note 3, *supra*.

tion project designed to train disadvantaged minorities in the use and operation of computers. IBM participates in the program by supplying instructors and computer equipment. When Hudson was transferred to the OIC, he was promoted to a level 53 position, and his salary was accordingly raised. In January 1973, appellant's manager at the OIC, Dr. L. Henry, gave appellant a "1" rating, the highest possible appraisal level. Moreover, in September 1973, appellant was promoted to level 55 and received another raise. At that time, he mentioned to Dr. Henry that he "would not mind" being promoted to Dr. Henry's position as manager of the OIC. However, appellant was ineligible to replace Dr. Henry under IBM's policy against promoting an employee from within a particular department to manage his former peers. Dr. Henry's position was ultimately given to Hosea Givan, a black who had not previously worked at the OIC.

On this appeal Hudson argues that Judge Carter applied erroneous legal standards as to the order and allocation of proof on his disparate treatment claims and therefore improperly concluded that he had failed to establish a prima facie case. Plaintiff argues that the standards applicable in an employment discrimination action pursuant to 42 U.S.C. § 1981 are those set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), a Title VII case.[5] In that case, the Court held that a plaintiff may establish a prima facie case of racial discrimination in the employment area by showing:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

At least three circuit courts have held that the *McDonnell Douglas* criteria should apply to section 1981 cases,[6] and the appellees here have in any event so conceded. We agree. Once the complainant has established a prima facie case, the burden then shifts to the respondent to show some legitimate reason for the employee's rejection. The employee must then be afforded a fair opportunity to prove that the employer's reason was pretextual. Id. at 802–04, 93 S.Ct. at 1824–25.

■ The record here amply supports Judge Carter's position that Hudson failed to establish a case of discrimination. Appellant's argument that he was not considered for promotion to the position of OIC manager in the fall of 1973 because of his race is particularly unpersuasive because that position was concededly filled by a black man. Similarly, Hudson's claim that IBM's failure to promote or transfer him to a position out of the OIC in the summer of 1973 was racially motivated fails because Hudson offered no proof below that any particular position in management development, personnel or equal opportunity was even available during that period. Moreover, appellant has conducted no pre-trial discovery to determine if any such position was available at the time. Appellant's argument that IBM failed to promote him beyond level 52 at the New York Programming Center in 1970–71 again founders since he failed to show that any particular higher position was available or that he was in fact qualified for such a position. Finally, Hudson argues that he was denied proper job assignments at the New York Programming Center in 1970–71. But again he failed to establish at trial what proper job assignments were available at the Center, which at the time was scheduled to be phased out. Further, there was no showing that such assignments were ever given to whites.

---

**5.** 42 U.S.C. § 2000 et seq.

**6.** *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277 (7th Cir. 1977); *Sabol v. Snyder*, 524 F.2d

1009 (10th Cir. 1975); *Long v. Ford Motor Co.*, 496 F.2d 500 (6th Cir. 1974).

■ Appellant's contention that under *McDonnell Douglas* Judge Carter should have permitted him to proceed to introduce evidence with respect to the four elements set forth in that case,[7] and then have required the defendants to wait until plaintiff rested to establish non-discriminatory reasons for the challenged acts, is meritless. Three of the seven principal witnesses called by counsel for Hudson during his case-in-chief had previously been designated by defendants as their own witnesses. In order to expedite matters, the defendants were permitted to present much of their case-in-chief by examining their own designated witnesses and plaintiff's other witnesses after they had been called and examined by plaintiff. Having chosen this order of proof presumably for his own strategic purposes, it is hardly appropriate for Hudson to complain here that Judge Carter somehow committed error. There is no showing of any prejudice here particularly since Judge Carter offered the plaintiff the opportunity to present any rebuttal testimony at the close of the defendants' case. None was forthcoming.

We conclude that the record amply supports Judge Carter's finding that the plaintiff failed to prove that he was discriminated against as to promotions, transfers, or assignments because he was black. Nor has he shown any prejudice resulting from the order and allocation of proof here which was one he deliberately chose to adopt.

■ Hudson also argues that Judge Carter erroneously failed to consider statistical evidence concerning the racial composition of the work force at the New York Programming Center. The statistics purported to establish that black professional employees were discriminated against in advancing beyond level 52 positions at IBM. Judge Carter held that the statistical data

alone would not establish a prima facie case. However, he held that they could be used to bolster a claim of race discrimination, and he admitted them into evidence. We find no error in this determination. In "disparate impact" cases, where plaintiff alleges that an entire class or category of minority workers are adversely affected by an employer's facially neutral policy, and in class actions alleging racially discriminatory employment practices, statistical evidence may establish a prima facie case of discriminatory effect. *Reed v. Arlington Hotel Co., Inc.*, 476 F.2d 721 (8th Cir.), cert. denied, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); *Spurlock v. United Airlines, Inc.*, 475 F.2d 216 (10th Cir. 1972); *Jones v. Lee Way Motor Freight, Inc.*, 431 F.2d 245 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). This is not, however, a class action or disparate impact case, but rather an individual "disparate treatment" action, where the particular employee must establish that he has been discriminated against because of his race. See *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 & n. 15, 97 S.Ct. 1843, 1854–55 & n. 15, 52 L.Ed.2d 396 (1977). Hudson has failed to establish his case and the statistics standing alone do not create it. See *King v. Yellow Freight System, Inc.*, 523 F.2d 879, 882 (8th Cir. 1975).

■ Finally, Hudson claims that he was the victim of alleged acts of retaliation because he made a formal complaint with the New York State Human Rights Division alleging that IBM had discriminated against him. As noted above, then Judge Tyler dismissed the retaliation aspects of Hudson's complaint on the ground that section 1981 applies only to discrimination based on race, and not to retaliation for the racially neutral act of filing a complaint

7. We note that the four *McDonnell Douglas* factors are not an inflexible formula for proving racial discrimination in the employment context. As the Supreme Court noted in *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977):

The importance of *McDonnell Douglas* lies, not in its specification of the discrete ele-

ments of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

with an administrative agency. *Hudson v. IBM, supra*, 9 EPD ¶ 9991 [CCH], citing *Tramble v. Converters Ink Co.*, 343 F.Supp. 1350 (N.D.Ill.1972). In any event, Judge Tyler did not strike the allegations of retaliation from the complaint in view of the possibility that the plaintiff might be able to prove retaliation as some evidence of his basic discrimination claim under section 1981. Whether or not *Tramble*, upon which Judge Tyler relied, is sound, the point is that Hudson failed to establish any acts of retaliation. In fact the plaintiff is still employed by IBM in a high ranking position.[8]

Accordingly, the judgment of the district court is affirmed.

---

**8.** At the time of trial, appellant held a level 57 position and testified that his salary was "[a]round $35,000 or $36,000 a year."